Thank you, Your Honor. George Schreyer, appearing for Mr. Diaz. Your Honor, I wanted to start by saying that I came across something when I was reading the briefs in preparation for argument, which I didn't catch on to before, and I just wanted to lay it out for you because this was just bad lawyering. On page ER 37, that's part of the Court of Appeals opinion. The Court sets forth the standard for excluding a statement as being involuntary, and it says there's two parts to that. It's got to be both involuntary and unreliable, and it cites for that People v. Wray, which is a California Supreme Court case from 1996. Then at ER 44, in the second to the last paragraph, it talks about why this statement was reliable. And that is not the correct legal standard. Reliability does not enter into this under a United States Supreme Court case, Jackson v. Denno, which is cited at page 29 of the opening brief. Specifically, page 378, United States Reports 384 to 385, it says reliability doesn't matter. If it's involuntary, it's involuntary regardless of how reliable it might be. It doesn't say it that way, but that's the implication of what it's saying. So what does that mean? I mean, this is a factor that the State Appellate Court takes into consideration when finding that the statement is not involuntary. And yet it's relying on reliability, which you're not supposed to do. It looks like part of the problem with the Court of Appeals' decision is not that it's, well, it's that it's contrary to, it's not just an unreasonable application of Federal law. It's contrary to Jackson v. Denno, which sort of adds to the problems with the, with their decision. Well, do you know if the argument you're, or the, not the argument, the point you've recognized by rereading the case, was that argument made to this Court? Not to this Court, not us, but to the State court? I don't know that it was, but I assume that it was, because I can't imagine why the State court would decide it unless it was... Well, you've said that the State court resolved the case on grounds of unreliability. Partly on unreliability. Did the State court, I don't, maybe I need to reread it. In terms of involuntariness, they didn't touch on that at all in that case? They did. They did, absolutely, yes. Yes, it's, but it's part of the, they're sort, okay. So the bottom line is this was not coerced. In reaching that decision, they talk about reliability. Right, so it's a factor that enters in to the ultimate decision that this was not coerced. Help me out a little bit. I have found and read the passage quoting from Ray on ER 37, but then you referred to a later page. Oh, it was 44. And on 44... Second to the last paragraph, second to the last full paragraph. We also agree with the people that the reliability of D.S. is state in that paragraph. That's correct. So I just wanted to get that out there, because for some reason it just never dawned on me before. Now is the time. Now is the, better late than never. The other thing I want to talk about briefly is, you know, in the opening brief from pages 17 to 27, I go through the statement, you know, this discussion, pointing out the parts of it which I contend are either implied promises of help or implied threats of if you don't talk, bad things will happen. So those are sort of flip sides of the same thing. But there's just pages upon pages of that sort of thing in the record. In preparing for the case when I did the briefing, I read dozens of, well, you can imagine, coerced confession cases. I read about a dozen or so that dealt with this particular problem, which are statements related to the parent-child relationship. If you don't talk, you might become, you might lose contact with your child or become part of, lose, not become part of your child's life. In none of the cases in which they've revert or found it to be coercive have there been this many of these kinds of statements. They're usually like isolated comments here and there, like in the Langham case and in the Tingle case. It's just a few comments. But in this one here, there's literally dozens of these comments. And sometimes it really does come close to the line of being an express promise. There's one in particular that I wanted to highlight. Actually, there's a bunch that I want to highlight, but you've heard it all. And I'm going to spare you that because you can read all about it. But the one that really strikes me is on page, let's see, where is it? Oh, God. I've lost it again. Page ER-127. Here's what the officer says. Tell me the truth. I will relocate you with your baby. I can do this. I do it all the time. I mean, to me, it's not like an absolute promise. I will, you know, I promise that I'm going to do this. But it's like as close as you come to this. He is holding out this hope that if this man makes this statement, he can relocate with this child. I've done it before. I can do it for you. That's not an express promise, but it's as close as you come. But it's part of the tenor of the statements he makes. Repeatedly, he'll say, we're holding out something for you to do for yourself. You know, give yourself a chance. Save your ass. You know. Well, what it seemed to me was Diaz didn't want to confess. I wouldn't want to make a statement because he was concerned that other members of the gang, his gang, might view him as a snitch and go after him. And the officer was offering protection in that case. Well, I mean, that's part of the whole picture. Can the officer do that? I mean, is that actually true? No, that's definitely. Yeah, he definitely. There is some concern about if I speak, I might be in jeopardy. And assurances, don't worry about that. But that's just a very small, isolated statement in the midst of this sort of tempest of statements about someone else will call your daughter daddy. And, counsel, clearly that was said more than once. Many, many times. And you're right. But as I've read the transcript now a couple of times, and I didn't see anywhere, maybe you can help me find this place, where the bait is thrown by the officer, but I don't see your client taking the bait until they talk about bail. And once they start talking about bail, then he's, okay, now I'll tell you what really happened. Can you point us to a place in the transcript where, when they're talking about the child, the photo of daddy, that that piques your client's interest? Well, I mean, there's no specific point where he says, oh, yes, that's, I mean, everything is inferential, including what Your Honor says about bail, and then he makes a statement. That comment about bail, though, comes at the end of dozens of these other things. So it's kind of like, I mean, I don't know that that's the thing that's all of a sudden getting him to the point of making the statement. It seems to me that they've been playing on this theme about if you want to be with your daughter, give us the statement all along. And it may be that it just kicks in coincidentally after that. Your argument would be that's what puts it across the finish line. I don't think that that's what puts it across. I don't know what puts it across. What I mean is that you're saying that what your argument is, I understand, is that there are all kinds of things that were said, and the fact that he answered, okay, I'll talk after the bail, you can't view that in isolation. You have to view that in light of everything else that's been promised to him during the conversation. Okay. And I think there is one other thing, by the way, Your Honor, that's very significant, which is after he makes the statement, after he gives the confession to the police, the officer asks him, well, do you feel better now? And he says, yeah, I was thinking about my daughter. I mean, it's sort of like if you want to look at something that's specific about what's going through his mind. Do you remember what page that is? Yeah. It's on ER 163. Okay. Thank you. Did you feel better to give the statement, yeah, but I don't want to go to jail. I'm thinking about my little girl, man. That's the statement that he makes after he makes it. So if you want to know what's something explicit about what's on his mind, this is the thing he says right after he makes the confession. So that shows that that, at least in his mind, that was the motivating factor for the confession. Your Honor, I have about a minute and a half. You want to reserve that? May I, Your Honor? Okay. Thank you. Good morning, Your Honors. Deputy Attorney General Noah Hill on behalf of Respondent. May it please the Court. The California Court of Appeal reasonably determined that Petitioner's pretrial statements were not the product of coercion, promises of leniency, or threats by the officers, and the District Court properly denied the petition on that ground. The State Court reasonably determined the facts of Petitioner's case, and its rejection of Petitioner's claim was wholly consistent with clearly established federal law. And in this case, we have factual findings made by the State Court, and the factual findings are that the statements by the officers did not motivate Petitioner to ultimately make his admission to mere presence during the offense. Was the Court of Appeal correct to factor in the reliability of the statement in making its voluntariness decision? I agree that whether or not a statement is voluntary or is ultimately correct or trustworthy, it doesn't go into whether it's coerced. But I think that that wasn't a factor that the Court of Appeal was finding as a prerequisite or weighing it in, in turning the analysis of the claim. And I think its reference to the earlier case that counsel points out does not support, you know, that framework of the Court of Appeal. I think that passage actually, what they're saying is if a confession is coerced, then it's more, then you're going to have some extreme, or things that might not actually be true in that confession. Is there a law that supports that? Well, there's certainly law that warns of the dangers of coerced confession. Right. And I think its statement is simply a reflection that what we have here is not a coerced confession. And we know that on top of our finding that that is so, we know that because Petitioner knew things that we had not told him, and only that someone that would be present would know. That the car was a white Infiniti, that there was a revolver and a 9mm firearm used, that, of course, the victim was Randy, who Petitioner personally knew. And I'd like to address the statements about Petitioner's children, or daughter in this case. You know, the California courts and the district courts certainly don't condone, you know, that tactic, and this court needn't either, to find that this was not the motivating cause of Petitioner's statements. If you look at how those statements were received by Petitioner, he did not take the bait, as Judge Owens said. At one point, after a round of this, Petitioner says, cuts off the detective, after the sort of second gambit of saying the same thing. And Petitioner cuts him off saying, yeah, yeah, yeah, somebody's going to come in, and this is on 2 ER at 92. So, this is not someone who is frightened or moved by what's being said to him. After another round of these statements about family talk and losing his daughter, Petitioner says, fuck it, I don't know shit, I wasn't there. And that's at 97 to 98 of 2 ER. He also focuses intently, not on what's said about his potential of being separated from his daughter, but on what the officers know and what he can find out from the officers about what they know. He asks them questions whether or not his homies have flipped on him, essentially, what they've said, what the witnesses had said. And mind you, Petitioner knows that he has been identified because he knows Green, or excuse me, he knows Randy. So, he's aware that what's being said to him, at least by Detective Smith, is true. He does not, however, trust Detective Smith. And at one point, when Detective Smith says to him, you know, I can't do my job if I'm not trusted and respected. My word is everything on the streets, and I couldn't function as a detective without it. And Petitioner says to him, I don't know that because I don't know you. And he asks to speak to Officer Maldonado. Officer Maldonado comes in the room, whose friends are friendly with Petitioner. Petitioner trusts this man, couldn't bring himself to make a statement, couldn't bring himself to look Officer Maldonado in the eye after he ultimately made his last statement. And he confirms with Officer Maldonado that yes, there are three witnesses, and yes, that there is all of this evidence against him. And there's an exchange between them when he says, they've got enough to bring me in. Officer Maldonado confirms it. Yeah, they do. And they each say it a second time. There's enough to bring me in. Yeah, there is. It's here that Petitioner knows what he's up against. And it's for this reason that he comes out of that portion of the interview with Officer Maldonado, and then agrees to make the statement. And you can see he's already crafting what he's going to say during this portion of the interview by telling Officer Maldonado, you guys won't know the shooter. You won't believe who it is anyway. And Petitioner, when there's talk of these implied promises, Petitioner says repeatedly, I know you're not going to believe me. I'm not going to jail for a couple days. I'm going to jail for, like, 50 years. He says this over and over and over. And to view any potential implied promise on its own is, of course, a mistake. It needs to be viewed in the context of the repeated statements to Petitioner that no promises can be made and that anything that he says to the detectives needs to be investigated, verified, presented to the district attorney. These facts support the California Court of Appeals' rejection and steal that determination. Well, I'm going to presumption of correctness. There's been no evidence to rebut that presumption. And for these reasons, we would ask this court to affirm the judgment of the district court. Okay. Thank you. Thank you, counsel. Two brief points. Just, Judge Wardlaw, you asked about the California cases and how they were being used on the reliability part. And on ER44, that second to the last paragraph, the last sentence reads this. These facts correlated to victim Randy's description of events in Diaz's statement. Self-evidence is that they were the product of his personal participation in the crime rather than the manufactured story based upon coercion. That sentence means that they're using reliability as part of the rationale for holding that this is not a coerced confession. They just come right out and say it. Then they cite the Wray case for that proposition. So they're relying on reliability as part of their analysis. It's in the second to the last paragraph of the opinions. It's right before they come to the ultimate conclusion. So if we conclude that the court of appeal wrong or applies the wrong standard and applies the standard of reliability as part of the calculus. Correct. Is the argument then that this is an oval review? Is that where that gets us? I hadn't briefed it, but, yeah, I think so. If they are not following United States Supreme Court authority, it's not like is it unreasonable. It's just the wrong test or partly the wrong test. I mean, at worst, you just sort of add it into the calculus along with the reliability and lack of evidentiary support prongs of your AEDPA analysis. So I would think that it would be enough in and of itself. But at the least, it combines with the unreasonable application parts. Okay. Yeah. The last thing was the attorney general's argument is essentially that this man confessed for reasons other than the fact that all of these statements about your child. It just at some point, it just dawned on him that, I mean, here's what it sounds like to me. All of a sudden, it dawned on him that he didn't really care that much about his child, that he just wanted to help these officers out for no particular reason. He wanted no benefit. That just doesn't make any sense to me. After you've pounded on him so hard about his daughter and his relationship and losing that relationship and someone else being her daddy and so on and so forth, that now he just for no reason at all confesses. What does he get out of that under their scenario? I mean, nothing. I've just decided I don't care about my daughter and I care about you. Let me help you out and solve the case. It doesn't make any sense that he would do that. It's really the accumulation of all of these statements that eventually sort of hammer home, as they're meant to. That's why they're repeated. You say them often enough and eventually you get this guy to start talking to you. And he's trying to wiggle out every which way he can, but this is the only branch of hope that they've handed him. This is the only way he can pull himself out of the situation of losing his daughter, and that's what takes over. And that's the only reasonable interpretation of this repeated pounding on this thing. All right. Thank you, Counsel. Thank you, Counsel. Rodriguez v. Lewis will be submitted. We'll take up Bennett v. Barnes.
judges: Wardlaw, Fletcher, Owens